THOMAS SNOWDEN
*vs.*
EPHRAIM PIERCE.

## AT LAW. DECIDED JUNE 25, 1861.

*Appeal from the Decision of the Commissioner of Patents.*

Under the circumstances of this case it was not necessary for the appellant to go before the Examiner-in-chief under the new law, and then appeal to the Commissioner before appealing to this Court. It would give the Act of March 2d, 1861, a retrospective operation.

The principle laid down by the Court in Lovering *vs.* Dutcher governs this. That an inventor, to entitle him to the protection of the law, must be diligent in obtaining a patent. That by delay and neglect to give the public his invention, in presenting it at the Patent Office, he forfeits all claim to receive a patent.

Messrs. STANTON, LESKI, & FENWICK, attorneys in the case.

Statement of the case.

In April, 1860, Thomas Snowden, United States Inspector at the port of Pittsburg, obtained a patent on a valuable improvement in heating the feed water of steam boilers, by the direct agency of the live steam in the boiler.

Subsequently Ephraim Pierce and Wm. McClurg made separate application for patents for the same invention.

The Commissioner of Patents, according to the law of patents, declared an interference between the patent of Snowden and the said application.

At the hearing before the Patent Office, priority of invention over McClurg was awarded to Snowden, and priority of invention over both McClurg and Snowden, was awarded to Pierce.

The following is the opinion of James Dunlop, Chief Judge:

This is an appeal by Snowden, from the decision of the office, in the interference between his patent No. 27743, dated April 3, 1860, and the application for a reissue of Pierce's patent of June 12th, 1860, No. 28658, and the application of William McClurg.

The invention in controversy is for improvements "in heating the supply water for steam boilers."

The object of Snowden's invention, as stated by the office in its decision of the 6th of March, 1861, "is to avoid the *inconvenience* and *danger* due to the difference in temperature of different parts of the steam engine boiler, for supplying the water at a low temperature when operating under a high pressure of steam, and his invention consists in locating the feed water pipe within the *steam space* of the *boiler* having one end attached to the feed pump and the other end terminate in the *water* space of the boiler."

Pierce, in his application for reissue, claims the *same thing* as does also McClurg in his application. The interference was therefore rightly declared.

McClurg has taken no appeal to me from the decision of the officer of March 6th, 1861, and the controversy before me is narrowed to the *decision only* of the conflicting rights of Snowden and Pierce.

Mr. Leski's reply to Stanton's argument on the merits was filed with me the 1st of June, 1861, and Mr. Fenwick's closing argument on the 12th instant, when the case was submitted.

A preliminary question has been raised as to my jurisdiction of this case, the same having been decided on the 6th of March, 1861, four days after the passage of the Act of

March 2, 1861, entitled "an Act in addition to an Act to promote the useful arts." I will give my views generally of the true construction of this Act of March 2, 1861, and then of the special circumstances attending the decision of this case in the office.

Previous to the passage of the Act of March 2, 1861, all judicial acts done in the Patent Office, by the primary examiner or the Board of Appeals, organized under *office regulations*, were in intendment of law, the judicial acts of the Commissioners, and had no legal validity till sanctioned by him. The primary examiners and Board of Appeals under the old system were the organs of the Commissioner to *inquire* and *enlighten* his *judgment* and until the Commissioner gave validity to their judicial acts by his *fiat*, they had no legal existence as *judgments*.

Under the Act of March 2, 1861, the primary examiners and the examiners-in-chief, are by the terms of the Act recognized as judicial officers, acting independently of the Commissioners who can only control them when their judgments in due course come before them on appeal.

The Commissioner, under the Act of March 2, 1861, can *give no judgment* till the *appeal reaches* him, and this cannot be done till the judgment of the primary examiner has *first* been *submitted* to the examiners-in-chief.

The Judges of the Circuit Court of the District of Columbia, by law can entertain no appeal except from the *decisions* of the Commissioner. All the decisions of the office, whether by examiners or the old Board of Appeals were in law, the decisions of the Commissioner when sanctioned by him.— When a primary examiner under the old system refused a patent, or decided an interference case, and the Commissioner approved such decision, an appeal *lay* directly to one of the Judges from such decision of the Commissioner; *not so* under the new law of 1861. The primary examiners and the examiners-in-chief are all, by the Act of 1861, treated as *judicial officers* having power without control, *within the sphere of their duty*, to the exercise of their independent judgment. Their acts under the new law are not as under the *old system* the acts of the Commissioners, but their own acts. They are no

longer the mere organs of the Commissioner but independent officers. He can only reach and overrule them when their judgments come regularly before him on appeal.

It follows therefore that no *judgment now* in any patent case, of the character above described can be given by the Commissioner till it reaches him in due course by appeal, that is to say, the applicant must go from the primary examiner by appeal to the examiners-in-chief, and from them by appeal to the Commissioner, and lastly from the Commissioner to one of the Judges of the Circuit Court.

The appeal to the Judges lies from the Commissioner under the old system, and has not been expressly taken away. We have no right to infer or conclude that it has been taken away by *implication* by the creation of the Appeal Board of Examiners-in-chief, with the right of appeal from them to the Commissioner. All such *implication* is *repelled* by the *fact*, well *known*, that an express repealing clause in the Act of 1861, on its passage through the Legislature, was *stricken out*.

I think there is no repugnancy between the appeals given by the Act of 1861 and the ultimate appeal to the Judges, they may all stand together.

The ultimate appeal to the Judges is the same appeal which originally, under the old law, laid to the old Board of Examiners, outside of the office appointed by the Secretary of State.

This appeal extended to all final decisions of the Commissioner refusing an applicant a patent, or determining an interference, and was afterwards transferred to the Judges of the Circuit Court. I think this appeal to the Judges still exists, but it can only be exercised after the applicant has gone the rounds of all the tribunals created by the new law, and after decision of the Commissioner.

I do not think, however, under the particular circumstances of this case, the applicant, Snowden, was first bound to have gone to the examiner-in-chief under the new law, and then to the Commissioner, before coming to me. His case was submitted to the Commissioner before the passage of the Act of March 2d, 1861. All the testimony had been taken

and closed, the arguments made, and the case in the hands of the Commissioner for decision, before March 2d, 1861. To apply the Act to such a case would give it a retrospective operation. I entertain no doubt, therefore, that I have therefore regularly jurisdiction of this appeal.

On the merits of the dispute between Snowden and Pierce I need speak but a few words.

The principles to govern it have been carefully considered by me in the case of Lovering *vs*. Dutcher,[1] decided by me May 24, 1861, to which I refer, with authorities cited in it.

According to Mr. Pierce's own account, and the testimony of his witness, Arthur, he discovered this invention in March, 1857, and described it so particularly to Arthur that he, Arthur, or any skillful mechanic, could have applied it practically to steamboats. Pierce enjoined secrecy on Arthur, as the witness states, and a most important invention, saving expense in steam navigation on the Western waters, and materially contributing to prevent explosions of boilers and to save human life, and now in extensive use, is withheld from the public over three years. Pierce's *first movement* being to file a caveat on the 9th of February, 1860. Even this caveat gave no publicity, it went into the secret archives of the office, and was probably stimulated by the movements Snowden then had on foot and was pressing to secure the patent he applied for in the following March, and obtained on the 3d of April, 1860. But however this may be, Pierce's gross negligence in secreting and failing to patent his invention for more than two years after its discovery forfeits all right in him now to claim a patent. His caveat in February, 1860, was too late; he had lost his right then, more than two years had elapsed.

Nor would it do Mr. Pierce any good to treat his invention as immature in 1857, and in February, 1860, when he filed his caveat asking time to mature it (although Arthur proves it perfect in 1857, and capable then of being applied to steamboats as now) because he would still be in default and guilty of culpable negligence. He does not appear to have

[1]Page 367 of this volume.

experimented since 1857, or to have used any means further to mature his discovery in this long period, or to have made any additions to it; and cannot and ought not, in that aspect of the case, to stand in the way of a subsequent original inventor who had conceived and diligently pursued the same invention and applied for and obtained a patent.

The appellant's first and second reasons of appeal are sustained, and I do, this 25th of June, 1861, reverse the judgment of the Commissioner of Patents of March 6th, 1861, awarding priority of invention and patent to Ephraim Pierce on his reissue application.